UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

 UNITED STATES OF AMERICA                  :

                                           :        12 Cr. 127 (RJS)

       - against -

                                           :

 JOHN A. MATTERA,                          :

                       Defendant.          :


------------------------------------ X



**GOVERNMENT'S SENTENCING SUBMISSION**




                          PREET BHARARA,
                          *United States Attorney for the*
                          *Southern District of New York,*
                          *Attorney for the United States*
                                *of America.*


EUGENE INGOGLIA,
*Assistant United States Attorney*
       *Of Counsel.*

June 14, 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

UNITED STATES OF AMERICA            :

                                    :    12 Cr. 127 (RJS)

    - against -

                                    :

JOHN A. MATTERA,                    :

                     Defendant.     :


------------------------------------ X


### GOVERNMENT'S SENTENCING SUBMISSION

        The Government submits this memorandum in connection
with the sentencing of defendant John Mattera, currently
scheduled for June 14, 2013, and in response to his written
sentencing submission dated June 7, 2013 ("Def. Br.").

        In his sentencing submission, the defendant seeks a
below Guidelines sentence of 46 months' imprisonment, which he
argues is appropriate due to the impact of any lengthy sentence
on his family, his claimed efforts to make amends, instances of
past philanthropy, the impact of the millions of dollars in
investor losses on the calculation of the appropriate range of
imprisonment under the Sentencing Guidelines, and the need to
avoid unwarranted sentencing disparities among similarly situated
defendants.  (Def. Br. 2).  The Government believes a sentence
within the range of 108 to 135 months' imprisonment is
appropriate in this case, principally because of the need to

deter the defendant and protect the public from the defendant's repeated fraudulent schemes, and the egregiousness of the instant offense.  The Probation Department, in its Pre-Sentence Investigation Report (the "PSR"), has recommended a sentence of 120 months' imprisonment.  (PSR at 27.)

I.   **Procedural Background**

The defendant was charged in a complaint and arrested on November 17, 2011.  Thereafter, the defendant was charged in a four-count Indictment charging him with (1) conspiring to commit securities fraud and wire fraud, from in or about November 2009 up to an d including November 2011, in connection with a scheme to defraud investors by soliciting more than $11 million dollars under false pretenses; (2) securities fraud in connection with the same scheme; (3) wire fraud in connection with the same scheme; and (4) money laundering (PSR ¶¶ 1-5).  On October 2, 2012, the defendant pleaded guilty to the four-count Indictment before Your Honor, pursuant to a plea agreement with the Government.[1]  (PSR ¶ 8).  In the plea agreement, the parties agreed that the total offense level was 30, based on a base offense level of 7, pursuant to Guidelines Section 2B1.1(a)(1), a 20 level increase because the loss that resulted from the offense

---

[1] Your Honor accepted the defendant's guilty plea for Counts One through Three, but reserved as to Count Four.  If Your Honor does not intend to accept the plea as to Count Four, the Government is prepared to move to dismiss that count at sentencing.

was between $7 million and $20 million, pursuant to Guidelines
Section 2B1.1(b)(1)(K), a 2 level increase because there were
more than 10 victims, pursuant to Guidelines Section
2B1.1(b)(2)(A), a 2 level increase because the defendant was an
organizer or leader of criminal activity that involved fewer than
5 persons, pursuant to Guidelines Section 3B1.1©; a 2 level
increase because the defendant attempted to wilfully obstruct and
impede the administration of justice with respect to a closely
related offense, pursuant to Guidelines Section 3C1.1; and a 3
level decrease for pleading guilty and avoiding the need for
trial, pursuant to Guidelines Sections 3E1.1(a) and 3E1.1(b).
(PSR ¶ 8).  The plea agreement provided that the defendant had
the right to argue at sentencing that the obstruction enhancement
should not be applied. (PSR ¶ 8, footnote 1).  The Probation
Department agrees with the Government's calculation of the total
offense level as 30.  (PSR ¶¶ 51-60).

     In the plea agreement, the parties agreed that, based
on the information available, the defendant had 5 criminal
history points, and that therefore the defendant's criminal
history category was III.  The parties therefore agreed that the
applicable Sentencing Guidelines range for the defendant was 121
to 151 months' imprisonment.  (PSR ¶ 8).

## II.  The Application of the Sentencing Guidelines

     Most of the Guidelines issues are not in dispute,
consistent with the plea agreement.  The two open issues,

discussed below, are the appropriate criminal history calculation, and the applicability of an enhancement for obstruction of justice.

## A.    The Appropriate Criminal History Category

Since the plea agreement, and in advance of sentencing, the parties have re-examined the criminal history calculation. The defendant argues that the appropriate criminal history level is II, and that the defendant has only three criminal history points.  The Probation Department concurs with this calculation. (PSR ¶¶ 65-75, and page 24).

The issue is this: the parties and Probation agree that, as set forth in the plea agreement, the defendant properly received 2 points for his 2002 theft conviction in Circuit Court of Kentucky (PSR ¶¶ 66-67).  However, in the plea agreement, the defendant also was given one point for each of three convictions for three separate offenses, for which sentence was imposed on the same day by the 15th Judicial Circuit Court of Florida, West Palm Beach County (PSR ¶¶ 68-74).  The defendant was arrested separately in connection with each of the three cases, and the cases have different case numbers and involve different victims.

However, Guidelines Section 4A1.2, in defining "prior sentences," states as follows: "Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense **prior to** committing the second

4

offense)."  Section 4A1.2(a)(2) (emphasis added).

In this case, the defendant was arrested for the first offense on July 2, 2001, clearly <u>after</u> he committed the third offense between February 2000 and February 2001 (described in PSR ¶¶ 72-74) and after he commenced the second offense on July 1, 2001 (described in PSR ¶¶ 70-71).  The Government does not have any additional documents concerning the second offense, beyond what has been attached to the defendant's sentencing memorandum.

Therefore, absent some new factual information concerning the defendant's criminal history, the Government will take the position that the defendant is in criminal history category II, and that the appropriate Guidelines range for the defendant is 108 to 135 months' imprisonment (including an obstruction enhancement).

**B.   The Obstruction Enhancement Should Be Applied**

Section 3C1.1 provides for a two-level increase in the defendant's offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" regarding the prosecution or sentencing of the instant offense, and the conduct related to a closely related offense to the instant offense.  Guidelines Section 3C1.1.  Probation agrees with the Government that the defendant's conduct in the related case brought by the Securities and Exchange Commission, before United States District Court Judge Castel, warrants the application of this enhancement.

The defense objects, arguing that for the obstruction to apply, the Court needs to find that the defendant acted willfully, and noting that Judge Castel's opinion stated that he did not need to reach that issue to find Mattera in contempt of the asset freeze order to which Mattera had consented.  (Def. Br. at 5.)

The Government respectfully submits that this Court can make such a finding of willfulness, and that Judge Castel's Findings of Fact and Conclusions of Law On Civil Contempt (attached to defendant's sentencing submission as Exhibit A, hereafter "Castel Findings"), provide an ample factual basis for the Court to do so.

One of the provisions of the Consent Order required Mattera to hold and retain within his control, and otherwise prevent, "any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment or other disposal of any assets, funds, or other property," whether held in Mattera's name or for his direct or indirect benefit.  (Castel Findings at 3).

Mattera violated that provision repeatedly and with impunity.  For example, Judge Castel found that, after the entry of the Consent Order, Mattera sold a Lamborghini automobile in exchange for a $28,000 check payable to him; brought the check to the bank; and endorsed it to his mother, who deposited it into her account the next day.  (Castel Findings at 7-8).  Judge Castel, in his opinion, stated expressly that the "Court does not

find credible Mattera's [deposition] testimony that he never intended for Ann Mattera to deposit the cashier's check." (Castel Findings at 8).   Indeed, the Court found by clear and convincing evidence that "Mattera endorsed the cashier's check to Ann Mattera for the purpose of having her deposit the funds and have those funds be available to him for future use."   (Id.)

In addition, the Court found that Mattera requested and received a return of a $10,000 deposit he had previously made for a car; deposited it into an account he controlled in the name of an entity; and then cashed it out and made payments with it for "personal and business-related expenditures." (Castel Findings at 12-13).

As another example, the Court found that Mattera "violated the Consent Order by causing Ann Mattera to sell jewelry in exchange for $28,500" (Castel Findings at 12); and that Mattera "provided cash to Ann Mattera" – which was deposited into account in Ann Mattera's name – "with which to pay various personal and business-related expenditures" including expenses incurred by John Mattera. (Castel Findings at 11-12).

In finding Mattera in contempt, the Court found that the Consent Order was clear and unambiguous, that proof of noncompliance was clear and convincing, and that the defendant did not diligently attempt to comply in a reasonable manner. (Castel Findings at 19-22). The Court ordered, among other things, that Mattera pay a fine of $75,500; submit a verified

7

accounting listing of all assets, liabilities and property held by him directly or indirectly to the Court and the SEC; and submit all documents in his possession concerning the same. (Castel Findings at 25-26).  Mattera has failed to comply with these directives of the Court.

These examples of contemptuous conduct are not subtle. They are clear attempts to evade the Consent Order, and resulted in the dissipation of assets that could have been used to compensate victims, and impeded efforts to identify other such assets.  As a result, the Court has a sufficient factual basis to find that Mattera acted willfully, and to impose the obstruction enhancement.

In addition, the defense observes that the application notes to Section 3C1.1 contain a list of examples of obstructive conduct, and that one example that is "most analogous" is "failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. Section 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. Section 853(p)." Def. Br. at 5 (quoting 3C1.1 appl. note 4(J)).  The defense points out that the Judge Castel's Consent Order did not reference those sections.

But those forfeiture sections do not need to be referenced for the Court to find an obstruction enhancement here. Indeed, the application note itself states that the list of examples is a "**non-exhaustive** list of examples of the **types** of

8

conduct to which this adjustment applies" (emphasis added).  But the same concerns that animate the example of obstruction of orders concerning forfeiture, are present here, where the defendant willfully violated the Consent Order's asset freeze, which was designed to ensure that the defendant not dissipate assets that could be used to compensate victims of his fraud. The defendant's actions obstructed that goal, and as a result, there is less money available to begin to compensate the victims of Mattera's fraud, whether by means of restitution or forfeiture.  So while the willful violation of a court-ordered asset freeze in a related case is not listed as a specific example of obstructive conduct in the application notes, it is, as the defense states, "analogous" to such an example, and, especially when as here, the victims of Mattera's fraudulent scheme in the SEC case are identical to the victims of that same scheme in the instant case, it is an appropriate ground for an obstruction enhancement under Section 3C1.1.

## III. Sentencing Considerations Under 18 U.S.C Section 3553(a)

## A.   The Offense was Serious

The egregious nature of the defendant's fraudulent conduct is an important factor for the Court to consider in this case.

The defendant convinced people to invest their money with him, based on the his false representations that the investment vehicles owned shares of then-private, popular

9

companies such as Facebook and Groupon.  (PSR ¶¶ 15, 19).
Mattera further lulled investors into a sense of security by
promising that the funds they invested would be held safely in
escrow.  (PSR ¶ 20).  Instead, investors money flowed directly
through the escrow accounts into accounts controlled by Mattera,
and Mattera spent millions of dollars of that investor money on
his own personal expenses.  (PSR ¶ 20).  This, essentially,
flat out stealing, and the investors were left without their
investment, and without the promised shares. Investors lost
approximately $13 million.[2]  The egregious nature of this conduct
warrants a serious sentence.

**B.    A Substantial Sentence is Needed to Deter the Defendant and
       to Protect the Public From the Defendant's Repeated and
       Ongoing Fraudulent Activity**

        The most compelling single factor in this case weighing
in favor of a substantial sentence is the fact that the defendant
has been repeating this very type of crime repeatedly, year after
year, and avoiding serious consequence.  Indeed, his criminal
history suggests that of a career con-man.  In January 2000,
Mattera was arrested and ultimately convicted in state court in

_____

        [2] The Government will submit to the Court and defense
counsel under separate cover a list of victims and individual
loss amounts.  The Government has consulted with the defense on
this point, and the parties will discuss in advance of sentencing
whether they can agree on the exact amount for purposes of
restitution and forfeiture.  The defense already has agreed to a
preliminary order of forfeiture in the amount of $11.8 million,
for in excess of the amounts recovered by the Government or in
apparent possession by the defendant.

Kentucky, of taking $175,000 from an individual in return fro promises by Mattera to provide him with stock that Mattera claimed he owned, but in fact did not. (PSR ¶¶ 66-67). In July 2001, Mattera was arrested and ultimately convicted of an advance-fee scheme based on misrepresentations by Mattera, between 1998 and 1999. (PSR ¶¶ 68-69). In November 2001, Mattera was arrested and ultimately convicted of obtaining more than $20,000 from an individual in approximately July 2001 on false pretenses. (PSR ¶¶ 68-69). In February 2003, Mattera was arrested and ultimately convicted after defrauding investors in 2000 and 2001 who paid Mattera for particular stock; Mattera took their money but they never got any stock. (PSR ¶¶ 72-74). Although Mattera's sentences in these cases included restitution orders, the Government has been unable to confirm whether any money has ever been paid in even partial satisfaction of those orders.

In addition to the criminal matters, in June 2009, the Securities and Exchange Commission charged Mattera and others in a penny stock scheme with, among other things, disseminating false and misleading press releases from February 2006 through November 2007. In 2010, Mattera consented to injunctive relief and an order to pay disgorgement and a civil penalty. *See* SEC Litigation Releases (attached as Exhibit A).

The most severe penalty Mattera received was a sentence of one year imprisonment by the Circuit Court of Kentucky,

imposed in February 2002.  That sentence did not deter Mattera from engaging in the penny stock scheme for which he was charged by the SEC; nor did it dissuade him from engaging in the instant offense.  Indeed, the instant offense is similar in nature (if larger in magnitude) to some of the older frauds for which he was convicted in the past.

Mattera has either failed to appreciate the magnitude of the wrongness of taking other people's money, or he simply does not care.  Repeated convictions and injunctions have not dissuaded him from returning time and again to criminal activity. In order to deter him, and to protect the public, a substantial sentence is warranted here.

## C.  Mattera's Claims Regarding Restitution, "Cooperation" and Charitable Acts

The defense submission claims that the defendant has voluntarily cooperated with the Securities and Exchange Commission.  The Government has consulted with the SEC on this point, and the SEC has indicated that it does not believe that Mattera (who violated the Consent order in the SEC's case) has been remotely cooperative, and intends to submit a letter to the Court in response.  Indeed, Mattera's claims that he wishes to make full restitution are belied by his failure to comply with the orders in the SEC case concerning identification of his accounts and assets.

It is true that the defendant brought certain matters

(unrelated to the instant case) to the Government's attention through counsel and via proffer.  After meeting with the defendant, the Government did not offer to enter a cooperation agreement with the defendant.  The Government agrees that the Court may consider such efforts by the defendant under Section 3553(a) if the Court believes it demonstrates a change of heart or true remorse, but the Government does not believe that any significant weight should be accorded to them.

Finally, the defendant lists some past charitable contributions as evidence that he is "not without his share of redeeming qualities." (Def. Br. at 14).  The Government respectfully submits that this should not be accorded very much weight.  The amount of the fraud in this case dwarfs the defendant's charitable giving.  Indeed, if how one spends money is an indication of one's priorities, it should be noted that during the course of the fraud and at the time of some of his charitable gifts, Mattera was spending $45,000 a month to live in a palatial home on the water in Fort Lauderdale, leased and bought multiple expensive sports cars, and purchased thousands of dollars of expensive jewelry, all at a time when the only income the Government has been able to see for him came directly from the pockets of investors.

## D.   Mattera's Family Circumstances

The defense argues that the defendant's family circumstances should be treated as a mitigating factor at

sentencing. (Def. Br. at 12-13).  Family circumstances are a discouraged basis for a downward departure under the Sentencing Guidelines.  The Guidelines provide that "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. Section 5H1.6.  The Second Circuit has stressed repeatedly that "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *United States* v. *Londono,* 76 F.3d 33, 35 (2d Cir. 1996) (internal quotation marks omitted); *accord United States* v. *Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997).

Here, Mattera's three divorces (Def. Br. at 12) do not seem to warrant any extraordinary consideration by the Court. And his concern for his mother, while admirable, does not rise to the level of such an extraordinary circumstance as to justify any significant reduction in sentence under Section 3553(a); particularly where, as it appears was the case here, the defendant used his mother to help hide money and evade the Consent Order.

**E.   The High Loss Figure Does Not Overstate the Egregiousness of the Defendant's Conduct**

The defendant argues that, in securities fraud cases, the ascribed loss can be a poor indicators of the seriousness of the offense or the need for deterrence. The defendant cites to

14

United States v. Gupta, 2012 WL 5246919 (S.D.N.Y. Oct. 24, 2012),
in support of that proposition.  On the facts of this case, the
defendant could not be more wrong and the comparison cannot be
less apt.

It may be, in some accounting fraud cases in which the
loss is measured by the harm to shareholders, or the amount of a
company's restatement of its financial records, that the loss is
so high as to make the Guidelines loss calculations an imperfect
measure of the culpability of the individual defendant.  That
might even be true, although it is by no means certain, in some
cases in which the loss amount is disproportionately different
than the gain to the defendant.

But that's decidedly not this case.  Here, the amount
of the fraud almost exactly tracks the gain to the defendant.
The defendant here was, basically, directly stealing the money of
the investors, and using it for himself to line his own pockets,
support his own interests and, not incidentally, to support a
lavish lifestyle for himself.  The measure of the loss here is
extraordinarily relevant both to the degree of harm suffered by
the investors and the degree to which the defendant gained from
his misconduct and, as such, is hardly incidental to this fraud -
-it is central, and it is a perfectly reasonable and appropriate
measure.  Indeed, in cases such as this one, in which the measure
of harm and the measure of gain to the defendant track so
tightly, the best way for the Court to avoid any unwarranted

sentencing disparities between similarly situated defendants, is to give strong consideration to the Guidelines.  In this case, the defendant's criminal history calculation so strikingly understates both his criminal history and, more broadly, his history of fraud, that any perceived danger that giving too much weight to the loss amount would somehow result in an unfair sentence, is manifestly unlikely.

<u>CONCLUSION</u>

For all of the reasons set forth above, the Government believes a sentence within the Guidelines range of 108 and 135 months' imprisonment would be an appropriate sentence in this case.

Dated:      New York, New York
            June 14, 2013

                        Respectfully submitted,

                        PREET BHARARA
                        United States Attorney


                    By:_____/s/_____
                        Eugene Ingoglia
                        Assistant United States Attorney
                        212-637-1113


cc:       Carl Schoeppl, Esq.
          (By email)

Exhibit A



**U.S. Securities and Exchange Commission**

**U.S. SECURITIES AND EXCHANGE COMMISSION**

**Litigation Release No. 21105 / June 25, 2009**

*Securities and Exchange Commission v. Prime Time Group, Inc.,*
**Case No. 09-80952-CIV-COHN (S.D. Fla.)**

The Securities and Exchange Commission today charged Prime Time Group, Inc. (now known as Hunt Gold Corporation), its former chief executive officers, Johnny Ray Arnold and Dallas L. Robinson, and its former chief operating officer, Troy K. Metz, with securities fraud for their participation in the dissemination of materially false and misleading press releases. The Commission also charged Prime Time, Arnold, and one of Prime Time's largest shareholders, John A. Mattera, with securities antifraud and registration violations for their participation in a fraudulent scheme to evade the registration requirements.

The Commission's complaint, filed in the United States District Court for the Southern District of Florida, alleges that from February 2006 through November 2007, defendants Prime Time, Arnold, Robinson, and Metz participated in the dissemination of false and misleading press releases to the public concerning, among other things, Prime Time's acquisition and ownership interest in a Puerto Rico convenience store franchise, agreements the Company claimed to have with other wireless businesses, and its purported acquisitions of other companies.

The complaint also alleges that during the same period, Prime Time, Arnold, and Mattera made false statements to the Company's transfer agent in connection with a fraudulent scheme involving the issuance of bogus promissory notes. This scheme allowed Mattera to obtain millions of unlegended shares of Prime Time stock, most of which he later sold in the open market in November 2007.

The complaint further alleges that Prime Time, Arnold, and Mattera violated the securities registration provisions by engaging in unregistered distributions of Prime Time stock. For instance, the Commission alleges that Prime Time, Arnold, and Mattera engaged in an improper "gypsy swap" transaction in which Mattera agreed to transfer his unlegended shares to various stock promoters on behalf of Prime Time. In return, Mattera received restricted stock from the Company. This scheme was designed to circumvent the securities registration requirements because Prime Time could not legally issue unrestricted shares to the stock promoters without filing a registration statement.

The Commission's complaint charges: Prime Time, Arnold, and Mattera with violating Sections 5(a) and 5(c) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; and Robinson and Metz with violating Section 10(b) of the Exchange Act

and Rule 10b-5 thereunder. In its complaint, the Commission seeks permanent injunctions and civil penalties against all the defendants, disgorgement plus prejudgment interest against Mattera, and penny stock bars against Arnold, Robinson, Metz, and Mattera.

On June 15, 2009, the Commission temporarily suspended trading in the securities of Hunt Gold Corporation (Prime Time's new name) because of questions raised about the accuracy and adequacy of publicly disseminated information concerning, among other things, Hunt Gold's gold mining exploration business. The Commission staff acknowledges the assistance of the British Columbia Securities Commission in its investigation.

For further information, see <u>Exchange Act Release No. 60109</u> (June 15, 2009).

➢ <u>SEC Complaint in this matter</u>

*http://www.sec.gov/litigation/litreleases/2009/lr21105.htm*

Home > Litigation > Litigation Releases > 2010

## U.S. SECURITIES AND EXCHANGE COMMISSION

**Litigation Release No. 21627 / August 18, 2010**

**FINAL JUDGMENTS OF PERMANENT INJUNCTION AND OTHER RELIEF ENTERED AGAINST DEFENDANTS DALLAS L. ROBINSON, TROY K. METZ AND JOHN A. MATTERA**

*Securities and Exchange Commission v. Prime Time Group, Inc., et al.*, Civil Action No. 09-80952-CV-Cohn/Seltzer (S.D. Fla.)

The Commission announced that on August 9, 2010, the Honorable James I. Cohn, United States District Court Judge for the Southern District of Florida, entered final judgments of permanent injunction and other relief against Defendants Dallas L. Robinson, Troy K. Metz and John A. Mattera. The final judgments enjoin Robinson and Metz from violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The final judgment as to Mattera enjoins him from violating Sections 5(a) and 5(c) of the Securities Act of 1933 and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. In addition to the injunctive relief, both Robinson and Metz consented to a civil penalty of $25,000 and a five year penny stock bar, and Mattera consented to paying disgorgement of $70,000, plus prejudgment interest of $8,799.94, a civil penalty of $70,000, and a permanent penny stock bar. Robinson, Metz and Mattera consented to the entry of the final judgments without admitting or denying any of the allegations in the complaint and have fully escrowed the amounts they are required to pay.          .

The Commission commenced this action by filing its complaint on June 25, 2009, against Robinson, Metz, Mattera and others alleging that they participated in a fraudulent scheme in violation of the federal securities laws.

For more information on earlier actions in this case, see LR-21105 (June 25, 2009), LR-21590 (July 8, 2010).

*http://www.sec.gov/litigation/litreleases/2010/lr21627.htm*

*Last modified: 8/18/2010*